IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SYDNEY KRAVETZ, in her capacity as the personal representative of the Estate of Lawrence Kravetz, JONATHAN KRAVETZ, and CARRIE KRAVETZ, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 16 C 9194<br>) |
| BRIDGE TO LIFE, LTD., | ) Judge Joan H. Lefkow<br>) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiffs Sydney, Jonathan, and Carrie Kravetz sued Bridge to Life for breach of contract, promissory estoppel, unjust enrichment, and declaratory judgment. Bridge to Life moves for summary judgment on all counts. (Dkt. 125.) The motion is granted as to Jonathan[1] and Carrie and denied as to Sydney.[2]

---

[1] Because all plaintiffs share the surname Kravetz, the court refers to them by their given names.

[2] This court has jurisdiction under 28 U.S.C. §§ 1332 and 1367. Sydney and Carrie Kravetz are citizens of California. Jonathan Kravetz is a citizen of Washington. Bridge to Life is a Wyoming corporation with its principal place of business in Illinois. The amount in controversy between Sydney and Bridge to Life exceeds $75,000. Although there is reason to suspect that Carrie and Jonathan's claims never exceeded $75,000, (*see* dkt. 140 ¶ 36 (valuing their 20,000 shares at about $10,000 as of 2014)), this court has supplemental jurisdiction over their claims under 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b)(2).

1

## BACKGROUND[3]

Bridge to Life is a medical supply company focused on organ transplants. (Dkt. 130 ¶ 1.) Bridge to Life was incorporated in Delaware in 2005 and was authorized to issue 50 million shares of common stock. (*Id.* ¶ 2.) In 2014, Bridge to Life redomesticated to Wyoming. (*Id.* ¶ 21.) In connection with the redomestication, Bridge to Life wrote a letter to its shareholders, including the plaintiffs here, to request that they return their Delaware share certificates so those certificates could be exchanged for Wyoming share certificates. (*Id.* ¶ 23.) The Kravetzes returned their Delaware certificates but by the time they filed this suit had not received all their Wyoming certificates in return.

### I. Lawrence Kravetz's Shares

Lawrence Kravetz, a founding shareholder, submitted his Delaware share certificates representing 1.2 million shares in 2014. (*Id.* ¶¶ 3–4.) About a year later, Bridge to Life told Lawrence that 600,000 of his shares were issued in error. (*Id.* ¶ 36.) Bridge to Life therefore issued Lawrence a Wyoming certificate representing only 600,000 shares. (*Id.* ¶ 37.) After filing this suit, Lawrence died, and his wife Sydney now represents his estate. (*Id.* ¶ 3.)

In its motion, Bridge to Life asserts that it is undisputed that Lawrence was entitled to only 600,000 shares. (*Id.* ¶¶ 4–6.) According to Bridge to Life, its CEO Stevan Schweighardt reached out to Lawrence in 2008 to help raise funds for the company. (*Id.* ¶ 7.) But Lawrence told Schweighardt that he was reluctant to do so because Bridge to Life had never issued him

---

[3] Unless otherwise noted, the facts set out below are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court will address many but not all the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Following its regular practice, the court has considered the parties' objections to the statements of facts and includes in its opinion only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

shares it owed him for earlier fundraising efforts. (*Id.* ¶¶ 8, 10.) The two agreed that Bridge to Life owed Lawrence 600,000 total shares of common stock, and Schweighardt convinced the board of directors to issue 600,000 shares to Lawrence. (*Id.* ¶¶ 9, 11–12.) Lawrence and Bridge to Life signed a contract memorializing the agreement that Lawrence was entitled to 600,000 shares for his fundraising efforts. (*Id.* ¶¶ 13–14.) Unbeknownst to Schweighardt, Bridge to Life maintains, Lawrence already had received his shares when he entered into the agreement. (*Id.* ¶ 14.) Thus, according to Bridge to Life, the 2008 shares inadvertently duplicated the shares he already had. (*Id.* ¶ 14.) Bridge to Life also argues that because Sydney did not participate in these conversations and Lawrence died before he could be deposed, no one can dispute Schweighardt's testimony. (Dkt. 126 at 12.)

Bridge to Life is incorrect; Sydney can and does genuinely dispute Bridge to Life's story. Some evidence in the record supports her theory that Bridge to Life intended to issue a total of 1.2 million shares to Lawrence. First, although Lawrence was not deposed in this case, he made a statement about this issue under oath when he signed a verified complaint in Delaware in 2016 stating that he owned 1.2 million Bridge to Life Delaware shares. (Dkt. 131-1 ¶ 1; *id.* at 18–19 (Lawrence's signed and notarized statement that allegations in complaint made under penalty of perjury).) Second, there are inconsistencies between Bridge to Life's story and the documentary record. In the 2008 written agreement, Bridge to Life hired Kravetz as a consultant for a fundraising project in 2008 and compensated him with 600,000 shares of common stock "[f]or his service *on this project*"—not for all past, present, and future work. (Dkt. 128-3 at 7 (emphasis added).) Moreover, Schweighardt personally signed a share certificate awarding Lawrence 200,000 shares five months before the disputed award of 600,000 shares, undercutting his claim that no one at Bridge to Life knew that Lawrence had any shares when it issued the 600,000.

3

(Dkt. 131-2 at 5.) Finally, Lawrence received a certificate for another 100,000 shares in 2010, two years after Bridge to Life supposedly fixed Lawrence's lifetime aggregate at 600,000. (Dkt. 131-2 at 2.)

This is a textbook example of a genuinely disputed material fact. On a motion for summary judgment, the court must take all such disputed facts in the non-movant's favor. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007). The court therefore assumes for purposes of this motion that Lawrence held 1.2 million Bridge to Life Delaware shares, none issued by mistake, and received a Wyoming certificate for only 600,000 shares.

## II.     Jonathan and Carrie's Shares

Lawrence and Sydney's children, Jonathan and Carrie Kravetz, each held 20,000 shares of Bridge to Life Delaware common stock, which they received as gifts from their uncle Norman Kravetz. (Dkt. 130 ¶ 18.) After Jonathan received his redomestication letter, either Lawrence or Norman returned Jonathan's Delaware certificate in 2014. (*Id.* ¶ 33.) Bridge to Life sent Carrie's redomestication letter to Lawrence and Sydney in 2014. (*Id.* ¶ 27.) When Carrie did not return her Delaware certificate, Bridge to Life again wrote to her, but she did not receive that correspondence. (*Id.* ¶ 28.) In July 2016, Bridge to Life again wrote to Carrie at Lawrence and Sydney's address. (*Id.* ¶ 29.) At some point after receiving the July 2016 letter but before filing this suit, Carrie sent in her Delaware certificates. (*Id.* ¶ 30.)

In September 2016, the Kravetzes filed this lawsuit, by which point Jonathan and Carrie had not received their Wyoming share certificates. (Dkt. 1 ¶ 80.) In December 2016, Bridge to Life issued Jonathan and Carrie's Wyoming certificates, which their counsel received in January 2017. (*Id.* ¶ 38.) Carrie states that if she had her share certificates earlier, she might have tried to sell them to pay student debt and medical bills. (*Id.* ¶ 41.) Jonathan states that he would have

4

done the same to ease "a rough financial time." (*Id.* ¶ 33.) Otherwise, Jonathan and Carrie have no evidence of damages from receiving their Wyoming certificates in January 2017 instead of 2014. They neither tried to sell nor received offers to purchase their stock between 2014 and 2017 (or since). (*Id.* ¶¶ 47, 55, 60.) And they never took or tried to take part in Bridge to Life corporate governance. (*Id.* ¶ 51.)

### III. Bridge to Life Corporate Structure

At the time of redomestication in 2014, there were about 22.4 million outstanding shares of Bridge to Life common stock. (Dkt. 130 ¶ 22.) In January 2017, there were about 21.4 million outstanding shares of Bridge to Life Wyoming common stock. (*Id.* ¶ 39.) Because of new shares issued in employee incentive programs sometime after January 2017, there are now about 25 million outstanding shares of Bridge to Life Wyoming common stock. (*Id.* ¶ 40.) There is no evidence that Bridge to Life directors issued new shares to themselves. (*Id.* ¶¶ 49–50, 65.)

Bridge to Life common stock is unregistered and therefore not publicly traded, making shares difficult to sell. (*Id.* ¶ 69; dkt. 128-19 ¶¶ 1–2.) Shares were worth about 49 cents as of a June 2014 valuation, and in 2019 Schweighardt testified that he believed the shares had become more valuable since then. (Dkt. 140 ¶ 36.) Moreover, the shares hold little value for corporate governance. The plaintiffs admitted that "[s]ince its redomestication in 2014, BTL has not had a vote of the shareholders on any topic for any reason." (*Id.* ¶ 35.) On the same day they made that admission, however, they also filed a statement of additional facts asserting that "BTL has continued to hold shareholder votes since the redomestication," (dkt. 140 ¶ 38), citing an August 2016 election of directors. (Dkt. 131-24.) For purposes of this motion, the court assumes that this shareholder vote took place in August 2016.

5

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine fact issue exists, the court must go beyond the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott*, 550 U.S. at 378.

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

**ANALYSIS**

**I.     Choice of Law**

Bridge to Life cited Illinois authorities in its motion for summary judgment. The Kravetzes cited Wyoming authorities in their response. This court held in a ruling on a motion to dismiss that the court will apply the law of the state of incorporation to a "breach of contract

claim relate[d] to the [corporation's] issuance of stock." (Dkt. 42 at 4 (quoting *CDX Liquidating Tr.* v. *Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011)).) The same reasoning applies to the quasi-contractual claims of promissory estoppel and unjust enrichment. Wyoming law therefore applies. Because the parties have identified no relevant differences between Wyoming and Illinois law, the court does not consider any of Bridge to Life's arguments under Illinois law forfeited.

## II.     Sydney

### A.     Breach of Contract

Under Wyoming law, "[t]he elements for a breach of contract claim consist of a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages." *Schlinger* v. *McGhee*, 268 P.3d 264, 268 (Wyo. 2012) (quoting *Reynolds* v. *Tice*, 595 P.2d 1318, 1323 (Wyo. 1979)). Bridge to Life concedes that "the 2014 BTL letters constituted a contract supported by consideration." (Dkt. 126 at 9.)

There is a genuine dispute about whether Bridge to Life breached that contract. Sydney claims that Lawrence returned a certificate for 1,200,000 shares of Delaware stock but received a certificate for only 600,000 Wyoming shares, a breach of the contract to exchange share certificates. Bridge to Life argues that Lawrence was never supposed to have 1,200,000 shares of Delaware stock. But as explained above, Sydney disputes that assertion, and a jury presented with this summary judgment record could find in Sydney's favor. The motion for summary judgment must therefore be denied. *Anderson*, 477 U.S. at 248 (holding summary judgment must be denied if jury could return verdict for nonmovant).

7

Bridge to Life quickly pivots to its request for partial summary judgment, arguing that Sydney can receive only specific performance, not damages, if she succeeds at trial. Specific performance is available where damages are inadequate or impractical. *Rainbow Oil Co.* v. *Christmann*, 656 P.2d 538, 545 (Wyo. 1982). Bridge to Life argues that because unregistered shares are difficult to value, they cannot be compensated with damages, citing several Illinois cases. *Medcom Holding Co.* v. *Baxter Travenol Labs., Inc.*, 984 F.2d 223, 227 (7th Cir. 1993); *Farley Inc.* v. *Chiappetta*, 163 B.R. 999, 1010 (N.D. Ill. 1994); *Smurr* v. *Kamen*, 133 N.E. 715, 719 (Ill. 1921). But those cases gave specific performance to plaintiffs who requested it, establishing that specific performance is available, not mandatory. *E.g.*, *Medcom*, 984 F.2d at 225 (plaintiff requested specific performance). Moreover, damages are neither inadequate nor impractical here. Bridge to Life argues that because its shares are so illiquid, Sydney would reap a windfall if she received any money damages, effectively arguing that its share price is $0. If Bridge to Life believes its stock is as worthless as it argues here, it is free to return 600,000 shares to Sydney at no cost to itself. Otherwise, avoiding a windfall is a simple matter of appraising the shares, something that likely can be done because Bridge to Life did it in 2014. (Dkt. 140 ¶ 36.)

### B. Promissory Estoppel (Count II) and Unjust Enrichment (Count III)

Bridge to Life is entitled to summary judgment on Sydney's remaining state-law claims. Where an express contract exists, the plaintiff cannot recover on quasi-contractual theories like promissory estoppel and unjust enrichment. *Wagner* v. *Reuter*, 208 P.3d 1317, 1322 (Wyo. 2009) (holding promissory estoppel and unjust enrichment "are precluded by the existence of an enforceable contract"). Because Bridge to Life concedes that a contract exists, Sydney cannot recover on counts II (promissory estoppel) or III (unjust enrichment).

## C. Declaratory Judgment (Count IV)

Bridge to Life does not differentiate between the claims for breach of contract and declaratory judgment. For the same reasons as Count I, the motion is denied as to Sydney's portion of Count IV.

## III. Jonathan and Carrie

Jonathan and Carrie sued Bridge to Life for failing to issue Wyoming share certificates. Four months later, Jonathan and Carrie received their certificates. Jonathan and Carrie nonetheless pressed this lawsuit for another three years. The court permitted it to proceed on the theory that Bridge to Life did not issue equivalent Wyoming certificates to the Delaware certificates that Jonathan and Carrie returned. Discovery has debunked that theory. Jonathan and Carrie now claim that the delay itself caused them damages, but they present no evidence of damages. They argue that they should be allowed to proceed to trial to recover nominal damages. But because actual damages are an element of breach of contract, *Schlinger*, 268 P.3d at 268, Bridge to Life is entitled to judgment as a matter of law. Finally, Jonathan and Carrie's requested declaration that Bridge to Life "must authorize and issue to Plaintiffs the full number of their shares of common stock in the Company" is moot because Bridge to Life has authorized and issued Jonathan and Carrie's shares.

### A. Dilution

Jonathan and Carrie argue that Bridge to Life caused damages by diluting their shares. In an earlier ruling dismissing Jonathan and Carrie's claims without prejudice, the court explained that diluting the value of shares "could support a claim for relief." (Dkt. 102 at 7.) Discovery has shown that the shares Bridge to Life returned to Jonathan and Carrie in January 2017 were not only not diluted, but they represented a slightly higher ownership stake in Bridge to Life

Wyoming than Jonathan and Carrie had in Bridge to Life Delaware. At the time of redomestication, Jonathan and Carrie each owned 20,000 out of about 22.4 million outstanding shares of common stock. (Dkt. 130 ¶ 22.) In January 2017, when Jonathan and Carrie's counsel received the same 20,000 shares apiece, there were about 21.4 million outstanding shares of common stock. (*Id.* ¶ 39.) Thus, Bridge to Life did not use the redomestication as a ruse to dilute Jonathan and Carrie's shares.

Jonathan and Carrie note that their shares are now diluted, even though they were not diluted when Bridge to Life returned the shares in January 2017. Sometime after Jonathan and Carrie received their Wyoming certificates, Bridge to Life issued common stock to employees under an incentive program. (Dkt. 130 ¶ 40.)[4] Today, Bridge to Life has about 25 million outstanding shares of common stock. (*Id.*) Although this means that Jonathan and Carrie now own slightly less of Bridge to Life than they owned at the time of redomestication, that dilution did not breach any contract or promise. The redomestication letter offered to "issue to you a new Wyoming stock certificate" in exchange for the return of Delaware certificates. (Dkt. 128-8.) That letter contained no implicit promise never to issue common stock to employees. (*Id.*) Nor do Jonathan or Carrie identify any other agreement not to issue more common stock. To the contrary, the articles of incorporation authorized Bridge to Life to issue up to 50 million shares of common stock. (Dkt. 130 ¶ 2.) Thus, even if dilution is an injury, it is not an injury caused by a breach of any contract.

---

[4] Jonathan and Carrie have abandoned their earlier accusation that Bridge to Life's directors issued shares to themselves. (*Compare* dkt. 128-17 ¶ 3; dkt. 128-18 ¶ 3, *with* dkt. 130 ¶¶ 49–50, 65.) They acknowledge that they never had evidence for that claim but alleged it as a matter of personal belief. (*Id.* ¶¶ 49–50, 65.)

**B.     Delay**

Jonathan and Carrie have no monetary damages from the delay. They argue that under Wyoming law, unreasonable delay in contract performance may cause damages. *See LNV Corp.* v. *Shepard*, No. 10-cv-56-F, 2010 WL 11450489, at *3 (D. Wy. Nov. 12, 2010). In *LNV*, a bank's delay in honoring credit-line draws meant that the borrowers could not pay subcontractors on time. *Id.* at *1. The subcontractors then quit the borrowers' construction project, forcing the borrowers to abandon it. *Id.* Because the borrowers in *LNV* had evidence that the bank's delay in performance tanked the construction project, the borrowers' claim survived a motion for summary judgment. *Id.* at *3.

*LNV* shows that delay theoretically can satisfy the breach and damages elements, but here it did neither. At most, Jonathan and Carrie suggest that they had expenses between 2014 and January 2017 that they might have tried to satisfy by selling their shares. Carrie says she had medical bills and student loans to pay. (Dkt. 140 ¶ 32.) Jonathan was "experiencing a rough financial time." (*Id.* ¶ 33.) They provide no supporting evidence of these expenses and therefore could not establish them at trial, let alone concretely enough to justify a specific damages calculation. This motion was their opportunity to present that evidence. *Siegel* v. *Shell Oil Co.*, 612 F.3d 932 (7th Cir. 2010) ("Summary judgment is the 'put up or shut up' moment in a lawsuit."). Moreover, even if they had evidence of how they would have spent the money if they had their shares earlier (assuming generously that they could and would have sold the shares), it would not suffice to prove damages. Instead, they must show why they would have been materially better off having the Wyoming certificates in 2014 instead of January 2017. They do not present evidence that the shares became less valuable between 2014 and January 2017 (the record suggests the opposite, (dkt. 130 ¶ 36)), that there was a more liquid market for Bridge to

11

Life shares in 2014 than in January 2017, or that they had to forgo some investment opportunity because they did not have their certificates in 2014.

Finally, Jonathan and Carrie argue that Bridge to Life's delay cost them the right to participate in Bridge to Life's election of directors in August 2016. (Dkt. 131-24.) But Jonathan and Carrie do not offer evidence about the result of the election, the margins of victory or defeat, or even how they would have voted. A jury thus could not find that Jonathan and Carrie suffered an unfavorable election result or that their inability to vote their shares caused that result. Because Jonathan and Carrie cannot prove damages on this theory, Bridge to Life is entitled to judgment as a matter of law. *Schlinger*, 268 P.3d at 268.

### C. Nominal Damages

Finally, Jonathan and Carrie argue that under Wyoming law, they can prove nominal damages even if they cannot prove actual damages. In *dicta*, the Wyoming Supreme Court has noted, "One can recover nominal damages for a breach of contract when no actual damage flows from it . . . ." *Pope* v. *Rosenberg*, 361 P.3d 824, 833 n.12 (Wyo. 2015). But in holdings, that court has explained that damages are an element of a breach of contract claim. *E.g.*, *Schlinger*, 268 P.2d at 268. Moreover, the Wyoming Supreme Court has held that if a trial results in a defense judgment for lack of actual damages, the plaintiff is not entitled to a new trial to prove nominal damages. *Reese* v. *Dow Chem. Co.*, 728 P.2d 1118, 1121 (Wyo. 1986). Finally, Jonathan and Carrie have cited no Wyoming authorities awarding nominal damages to plaintiffs who proved the first three elements of a contract claim but not the damages element. They cite the *dictum* in *Pope* and a century-old case where the Wyoming Supreme Court vacated a plaintiff's breach of contract judgment because "[t]he evidence . . . [was] insufficient to support a judgment for anything more than nominal damages." *Wilson* v. *McLogan, Inc.*, 242 P. 1111,

12

1112 (Wyo. 1926). Bridge to Life, on the other hand, identifies recent cases applying Wyoming law that grant defense judgments where the plaintiff did not prove damages. *E.g.*, *Sneve* v. *Mut. of Omaha Ins. Co.*, No. 13 CV 252, 2015 WL 12866983, at *4 (D. Wyo. Apr. 23, 2015). Wyoming law does not permit Jonathan and Carrie to take this case to trial over $1.

### D. Promissory Estoppel, Unjust Enrichment, and Declaratory Judgment

Both because a contract exists and because Jonathan and Carrie suffered no damages, Bridge to Life is entitled to summary judgment on Counts II and III. Bridge to Life is also entitled to summary judgment on Count IV, in which Jonathan and Carrie seek a declaration that Bridge to Life "must authorize and issue to Plaintiffs the full number of their shares of common stock in the Company." (Dkt. 111 ¶ 67.) Bridge to Life authorized and issued the full number of shares to which Jonathan and Carrie were entitled in December 2016, and Jonathan and Carrie received them in January 2017, all before Jonathan and Carrie filed their third amended complaint.

### ORDER

The motion for summary judgment is granted in part and denied in part. Summary judgment is granted in favor of Bridge to Life, Ltd. against Jonathan Kravetz and Carrie Kravetz on all counts. Summary judgment is granted in favor of Bridge to Life, Ltd. against Sydney Kravetz, in her capacity as the personal representative of the Estate of Lawrence Kravetz, on Counts II and III. The motion is denied as to Sydney Kravetz's claims in Counts I and IV.

Date: March 24, 2020

_____
U.S. District Judge Joan H. Lefkow